SIDNEY NORMAN and Others, Appellants, *v.* FEDERAL MINING AND SMELTING COMPANY and AMERICAN SMELTING AND REFINING COMPANY, Respondents.

First Department, December 7, 1917.

**Mines and mining — corporations — contract between mining corporations construed — fraud — action by minority stockholders to set aside contract upon ground of fraud — laches — failure to make demand upon corporation to bring action — excuse for failure to make such demand.**

In an action by the minority stockholders of a mining company to set aside a contract between said company and a smelting company, upon the ground of fraud and bad faith upon the part of the smelting company, its officers and agents, and the officers and directors of the mining company, it appeared that it was the custom of mining companies to sell their

output to smelting companies; that the smelting company in question was the only one of its kind large enough to handle the entire output of the mining company; that the mining company, being about to purchase another mine involving a large investment which it sought to procure through the sale of stock, found it necessary to show that it had con-
. tracts to take care of its output, and so procured an extension of a prior contract with the smelting company for a period of twenty-five years, which was approved by the stockholders of the mining company by unanimous vote, at which time the reason was given for the extension agreement, and the fact was disclosed that the smelting company was in control of the mining company through ownership of a majority of its stock; that certain of the plaintiffs voted in favor of said agreement through their proxies; that no one questioned the good faith and fairness of said contract until more than eight years thereafter when the falling off in earnings of the mining company, resulting from a diminution in the production of ores and from a decrease in the contents of metal in said ores, occasioned the dissatisfaction of the stockholders, which led to the bringing of this action.

*Held,* on all the evidence, that the extension agreement was made in good faith and should not be set aside for the reasons charged.

The fact that the plaintiffs, with opportunities at each annual meeting of the stockholders to question the validity or good faith of the contract, never indicated any opposition thereto, and allowed the officers of the corporation to continue to perform the agreement for more than eight years, constitutes laches fatal to the maintenance of the action.

It would be manifestly unfair to allow minority stockholders to remain silent and take for a period of years the profits of a contract which they claim afterwards to have been made in fraud of their rights, and then seek to avoid it when, for reasons outside the contract itself, it has ceased to prove attractive.

The failure of the plaintiffs to allege or prove any demand made upon the mining company or its board of directors to bring an action to set aside the contract is also fatal to the maintenance of the action.

A mere general charge of control of the mining company's affairs by the smelting company is not sufficient to excuse the failure to make such a demand.

An allegation in the complaint that the reason why the action is brought by the plaintiffs, as stockholders of the mining company and not by said company itself, is that its directors now in office are wholly under the control of the smelting company and act for its advantage, is not a sufficient excuse for failure to make a demand on the mining company to bring the action, where there is no allegation that the directors in office at the time of the commencement of the action are the directors who committed the alleged wrongs, and it appears that at the time but two directors of the mining company were men who had been in office when the agreement in question was made, and neither of these was associated with the smelting company.

APPEAL by the plaintiffs, Sidney Norman and others, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 23d day of July, 1914, dismissing the complaint upon the merits on the decision of the court after a trial at the New York Special Term.

*John J. Crawford,* for the appellants.

*William D. Guthrie [Graham Sumner* with him on the brief], for the respondent American Smelting and Refining Company.

*George Welwood Murray [George A. Gordon* with him on the brief], for the respondent Federal Mining and Smelting Company.

DOWLING, J.:

The plaintiffs, as stockholders of the Federal Mining and Smelting Company (hereinafter referred to as the Federal Company), have brought this action to set aside a contract dated October 16, 1905, entered into between said Federal Company and the American Smelting and Refining Company (hereinafter referred to as the Smelting Company), whereby the Federal Company sold to the Smelting Company all the lead-silver ores, slimes and concentrates that might be produced from its properties, for a period of twenty-one years from August 31, 1909. Plaintiffs represent a holding of twenty-four one-thousandths of the common stock of the Federal Company and forty-eight ten-thousandths of its preferred stock; or a holding of eleven one-thousandths of both classes of stock. The action is based upon allegations of fraud and bad faith upon the part of the Smelting Company, its officers and agents, and the officers and directors of the Federal Company who participated in the making and ratification of the contract, and upon further allegations that the individual defendants now constituting the board of directors of the Federal Company in office at the time of the commencement of the suit were continuing the fraud. It was further alleged that the approval of the contract in question was done at the behest of the Smelting Company and contrary to the interests of the Federal Company and with the intent to give

First Department, December, 1917.          [Vol. 180.

an unfair and undue advantage to the Smelting Company, which it is claimed dominated and controlled the Federal Company. The record discloses the following facts: Both the corporations in question are foreign corporations — the Federal Company being incorporated under the laws of the State of Delaware and the Smelting Company under those of New Jersey. The Federal Company soon after its organization in 1903 acquired certain mines in the Coeur d'Alene district in the northern part of the State of Idaho which produced ores containing lead and silver, the output of its mines constituting from forty per cent to forty-five per cent of the total output of the mines in that district. The custom of the mining companies in that territory was, not to smelt their own ores nor to market the mineral contents thereof, but to sell their output to smelting companies with whom they made the most favorable contract possible. As there was no one smelting company, at that time, large enough to take the entire output from any one large mine, it was customary to provide in the contracts a tonnage limit upon the amount of ore which the smelting company was obliged to take. This had the effect of keeping down the output from the mines. Since 1903 the Smelting Company has been the only one of its kind large enough to handle the entire output of the Federal Company, the combined capacity of the other smelting companies in the United States not being large enough to handle fifty per cent thereof; as the result of this it was necessary for the Federal Company to deal with the Smelting Company, if it desired to dispose of its entire output. On November 30, 1903, the Federal Company made a contract with the Smelting Company by which it sold to the latter for a period of six years from September 1, 1903, its entire output consisting of ores, slimes and concentrates, at prices therein provided and upon certain terms and conditions. The good faith of this contract is in no way attacked and at the time it was made there was no community of interest between the Federal Company and the Smelting Company, nor any domination of the former by the latter, either through official or stock control. In June, 1905, the Federal Company was negotiating for the purchase of the " Morning " mine involving an investment of $3,000,000, and Charles Sweeny, the president

of the Federal Company, in August, 1905, went to London and there arranged for the sale to Benson & Co. of that amount of stock wherewith to purchase the mine. Benson & Co. desired to know that the Federal Company had contracts sufficiently long and certain to take care of its output. The desirability of an extension of the contract with the Smelting Company for a period of twenty-five years in view of the existing conditions, and the necessity for a suitable market for the mine output, had already been submitted to the board of directors of the Federal Company by Mr. Sweeny in June, 1905, and referred to the executive committee. That executive committee on October 13, 1905, unanimously approved a form of contract between the two companies, whereby the contract made in 1903 was extended from its expiration on September 1, 1909, until August 31, 1930, upon terms substantially identical with the contract between the Smelting Company and the Bunker Hill and Sullivan Mining Company, which was the principal competitor of the Federal Company and the next largest producer in the Coeur d'Alene district, turning out about thirty per cent of the entire output. This proposed contract was conditioned upon its confirmation by the stockholders of the Federal Company and was so approved by them October 16, 1905, at their annual meeting, by unanimous vote of those present or represented by proxies. The president read a statement at such meeting which set forth the situation fairly and fully and gave the reasons for the extension agreement, and which disclosed the fact that the Smelting Company at that time was in control of the Federal Company through the ownership of a majority of the common stock which, as it appears, had been bought by Daniel Guggenheim from John D. Rockefeller, George Gould, Charles Sweeny and others in March, 1905. The price paid for this stock was $120 and Mr. Guggenheim bought all the stock offered to him at that price. Certain of the plaintiffs herein voted in favor of the said contract through their proxies. The contract which the Bunker Hill and Sullivan Mining Company had made with the Smelting Company was in fact, as Mr. Sweeny had represented it, a contract for the sale of its entire output for a period of twenty-five years, upon terms substantially the same as this agreement in question. After this

vote of the stockholders the contract in question was duly signed by both parties about October 16, 1905. In that month the Federal Company completed the purchase of the " Morning " mine for $3,000,000, and as the sale of the stock in London had fallen through, a loan had been arranged by Mr. Sweeny for that amount to pay for the mine, the title to which was pledged as security for the loan. To pay off this loan the Federal Company in November, 1905, offered to its stockholders $2,000,000 par of new preferred stock and $1,000,000 par of new common stock, two-thirds of each class being taken by the Federal Company's stockholders and the balance by a syndicate, which had been formed to underwrite any stock untaken by the stockholders. It was the settled policy of the Federal Company before the Smelting Company acquired control of its stock to buy additional mining properties to extend its life, and these negotiations for the purchase of the " Morning " mine lasting throughout the summer are not disputed to have been for the interest of the Federal Company. When the Federal Company desired to list its new stock, it filed with the New York Stock Exchange, as an inducement to the public to purchase such stock, a written statement that it had contracts with the Smelting Company having about twenty-five years to run, by which the Federal Company could sell its entire output to the Smelting Company. For years after this contract was made no one questioned its good faith or fairness. There was no concealment about the fact that such a contract had been made, and not only did the statement of the president of the company when the contract was submitted to the stockholders show the reasons for its making fully and fairly, but every one seems to have regarded it as a desirable contract to have been made at the time and to have been a real asset and advantage to the Federal Company instead of a detriment to it. The contract of 1903 is not attacked even in this suit. The differences between the contract of 1903 and that of 1905 are substantially: *First*, the extension of the contract did not obligate the Federal Company to mine or deliver any definite quantity of ore, but left it at liberty to mine or deliver from time to time as much or as little as it found profitable; *second*, there was no provision for a revision of the price schedule at the

end of a reasonable time; *third,* there was an additional provision giving the Smelting Company the right to designate deliveries to any smelting works wherever located and whether they were owned by the Smelting Company or by any other persons. The first modification was clearly for the benefit of the Federal Company. The second was to insure stability of price, which appears to have been one of the great *desiderata,* as the prices of lead theretofore had been uncertain and fluctuating and virtually fixed by a firm of brokers in New York city. The price fixed both by the contract of 1903 and the renewal of 1905 was on the basis of a selling price of four dollars and ten cents per 100 pounds for lead, which appears to have been fair at both periods, and as Mr. Sweeny testified, that was a high price and had not been reached in the ten years preceding 1903. The third modification is explained by the necessity of having smelting operations conducted where the requisite proportions of wet and dry ore could be present, available for smelting operations, and does not appear to have been in any way detrimental to the Federal Company. Under the contract as extended, business was carried on between the Federal Company and the Smelting Company, and the former paid dividends upon its common stock prior to 1908 of ten per cent to seventeen per cent, but since that time there have been no dividends upon its common stock save a dividend of one and one-half per cent in January, 1909; and since 1911 dividends upon the preferred stock have been reduced from seven per cent to six per cent. The falling off in the earnings of the Federal Company seems to have occasioned the dissatisfaction of the stockholders which led to the bringing of this action. Nothing was done even, under these conditions, save to make a request that the directors of the Federal Company cease complying with the terms of the contract of 1905, until this action was brought in February, 1913, a period of nearly eight years after the acts complained of. While the complaint charges actual fraud in the making of the contract, upon the argument of this appeal that claim is virtually abandoned and the appellants stand upon the claim of constructive fraud in that the domination and control of the Federal Company by the Smelting Company led to the making of the contract in question, in which the Smelting Company

was guilty of a breach of an equitable duty and took an unconscionable advantage which amounted to a fraud, because it put upon the board of the Federal Company its officers and employees to represent it in the making of this contract. As a matter of fact, while the executive committee of the Federal Company, after the purchase of the stock of Mr. Guggenheim, and its transfer to the American Smelters Security Company, was controlled by officers or employees of the Smelting Company, at no time were more than six members of the board of directors officers or employees of the Smelting Company. The appellants criticize the decision and opinion of the learned trial court upon the ground that they deal with the case as though the burden was upon the plaintiffs to show that the contract was unfair to the Federal Company. Of course, if plaintiffs were seeking to establish actual fraud, the burden of proof was upon them; but they contend that in view of the proof they have made as to the relationship of the two corporations and the introduction into the board of directors, executive committee and official positions of the Federal Company, of officers and employees of the Smelting Company, which was the result of the control of the common stock (which alone had voting power) of the Federal Company by the Smelters Security Company (which in turn was controlled by the Smelting Company), upon proof of these facts a relationship was established which called for the exercise of good faith in the making of this contract by the Smelting Company and the execution of a contract which was fair to both, which would not inure to the detriment of the Federal Company and which was neither improvident, inequitable nor unjust. Assuming that such a burden existed of showing affirmatively the fairness and good faith of the contract in question, the findings of the trial court establish that the defendants have borne and discharged that burden, and in my opinion the proof absolutely demonstrates that the contract in question was made in good faith upon both sides, with due regard for the interest of the Federal Company, was a desirable contract under the conditions which then existed and was an asset and of benefit to the Federal Company and not detrimental to it. The contract was not only a fair and desirable one to be made, but there was no concealment then or at any other

time about its terms and provisions, and its very period of duration, which is now complained of, was at the time deemed most advantageous for the Federal Company and no one thought of questioning its fairness or good faith or calling it fraudulent, wasteful or improvident until the disappearance of the dividends from the Federal Company. The inability of that company to pay dividends is not shown to have been in any way due to the making or performance of this contract, but, on the contrary, it fairly appears to be the result of a diminution in the production of ores by the Federal Company and of a decrease in the contents of metal in its ore bodies, both as to lead and silver.

An effort is made to attack the independence of action and good faith of Charles Sweeny, the president of the Federal Company at the time of the transactions complained of. But the proof establishes that he was never in any way connected with the Smelting Company, either officially or financially. He was an experienced mining man, thoroughly acquainted with the Coeur d'Alene district and its mining operations and whose activities in that region extended over a period of nearly twenty years. He appears upon this record to have intelligently and honestly represented the Federal Company in its contractual relationship with the Smelting Company, and to have acted in the best interest of the former throughout. His evidence shows the inadvisability of the Federal Company engaging in smelting operations on its own account (which no one then deemed advisable), nor is it suggested where the $12,000,000 could be procured which would be required to establish a suitable plant for its operations. Though he sold his common stock to Daniel Guggenheim at $120 per share, bought back into the Federal Company, paying as high as $180 a share for some of the common stock and bought considerable quantities of both common and preferred stock, after the making of the contract in question, his account of purchases and sales of both classes of stock being in evidence down to April 1, 1907, I believe that defendants have established not only the good faith of Sweeny, and that his actions in reference to the contracts in question were solely in the interest of the Federal Company and prompted by his best judgment therefor, but that they

have shown as well the good faith and fairness of action of both the executive committee and board of directors of the Federal Company. I am satisfied as well that the defendants have established that the agreement of October 16, 1905, was a fair contract from the standpoint of the Federal Company and that it was expedient and desirable for that company, at that time, to arrange for the extension of its contract with the Smelting Company until August 31, 1930. Upon the terms on which that extension was in fact made I, therefore, am in favor of affirming the judgment appealed from, with costs.

I have discussed the merits of the plaintiffs' claims herein, although I believe there were two objections raised to the maintenance of this action which were sufficient to prevent a recovery. The first is that plaintiffs have been guilty of laches in having waited nearly eight years, with opportunities at each annual meeting of stockholders to question the validity or good faith of the contract now attacked, but never indicating any opposition thereto until this late day and allowing the officers of the corporation to continue to perform the agreement. No stockholder made any objection as long as dividends were being paid, though the alleged grounds of attack upon the contract existed at all times. This is not a case of an agreement secretly or surreptitiously made, but any claim of concealment was disavowed upon the trial and no contract could well have been more openly and fairly made known to those interested as stockholders. It would be manifestly unfair to allow a minority stockholder to remain silent and take for a period of years the profits of a contract which he claims afterwards to have been made in fraud of his rights, and then to seek to avoid it when, for reasons outside the contract itself, it has ceased to prove so attractive to him. This unfairness has repeatedly led the courts to refuse relief where the lapse of time was much less than in the case at bar, and in cases where the period was from two to four years. (*Sheldon H. B. Co.* v. *Eickemeyer H. B. M. Co.,* 90 N. Y. 607; *Farmers' Loan & Trust Co.* v. *Bankers & Merchants' Telegraph Co.,* 119 id. 15; *Twin-Lick Oil Co.* v. *Marbury,* 91 U. S. 587; *Hoyt* v. *Latham,* 143 id. 553.) Furthermore, plaintiffs have failed to allege, or prove, any demand made upon the Federal Company or its board

of directors to bring an action to set aside the extension agreement. This is fatal to such an action as the one at bar. (*O'Connor* v. *Virginia Passenger & Power Co.*, 184 N. Y. 46.) Nor is the mere general charge of control of the Federal Company's affairs by the Smelting Company sufficient to excuse the failure to make such a demand. There is an allegation in the complaint " that the reason why this action is brought by the plaintiffs as stockholders of the Federal Company, and not by the Federal Company itself, is that the directors of said company now in office are wholly under the control of the Smelting Company and act in all matters for its advantage; for which reason the Federal Company is made a defendant herein." But there is no allegation that the directors of the corporation in office at the time of the commencement of the suit are the same as those who had committed the alleged wrongs; and in fact, at the time of the commencement of this action, but two directors of the Federal Company were men who had been in office when the contract in question was made, and neither of these was associated with the Smelting Company. So that there is not present here the customary reason for not making a demand upon a corporation which is assumed would be futile because the wrongdoers were still upon the board of directors and it is not to be assumed that they would prosecute in good faith an action based on their own misconduct. (*O'Connor* v. *Virginia Passenger & Power Co.*, *supra*, 52; *Bartlett* v. *N. Y., N. H. & H. R. R. Co.*, 221 Mass. 530.)

The judgment appealed from will, therefore, be affirmed, with costs.

CLARKE, P. J., LAUGHLIN, SCOTT and SMITH, JJ., concurred.

Judgment affirmed, with costs.